### CAMPYON CUTTER *v.* HENRY MOORE.

1. In an action against a captain of a steam boat, upon the statute, (*Rev. Laws* 369, *Sec.* 5,) for conveying away a slave ; proof that the defendant was *captain* at the time (the vessel being in her usual employ) is *prima facie* evidence that he was *on board* when the slave was conveyed away.

2. Proof that the defendant was *captain*, and on *board*, is also *prima facie* evidence that he knew that the slave was carried in the steam boat.

---

This was an action of trespass on the case brought by Cutter against Moore, to recover the value of a certain slave of the plaintiff, who was carried out of the state by the steam boat of which the defendant was the captain, and afterwards ran away and was lost. The pleadings in the cause, were precisely the same as those in the case of *Gibbons and Morse*, 2 *Halst. Rep.* 253. Upon the trial of the cause before the Court of Common Pleas of the county of Middlesex, a verdict was found for the defendant under the charge of the court; to this charge the following bill of exceptions was taken and brought up to this court, together with the judgment by a writ of error :

"Be it remembered, That on this twelfth day of March in the term of March, 1823, the trial of this cause came on before the Judges of the Court of Common Pleas of the county of Middlesex, upon the issue joined *pro ut* the pleadings. Whereupon the plaintiff in support of the issue on his part produced a bill of sale from Benjamin Winans to him for the negro in question, *pro ut* the same marked A,

and having proved the execution of the same by a subscrib-
ing witness the same was read in evidence to the jury. The
plaintiff then called as a witness Joseph Bonnington, who
testified he knew the negro man Michael and understood he
belonged to the plaintiff; that on a Sunday in the year
1820 or 1821, he came to Amboy and went on board the
steam boat Olive Branch; that the witness was employed by
Robert M. Livingston, to carry passengers on board the
steam boat from Perth Amboy for New York, she lay in the
stream, whether the negro went in his boat he does not
recollect; the passengers were sometimes taken from Amboy
to Staten Island, and were carried from thence to the steam
boat; whether the negro went to Staten Island first he does
not know, saw him get into the steam boat and saw him
some time afterwards in New York; negro had a pass;
being asked how he knew it was a pass he answered, he
read the paper all but two lines which he could not read,
the paper had the plaintiff's name to it but he did not know
it was his hand writing, he did not know his hand writing,
but he took it to be a pass to go abroad to look a master, he
saw the paper in Amboy. Witness did not see defendant
on board the steam boat when Michael went on board the
steam boat—he was the regular captain of the boat but
occasionally did not come to avoid injunctions—whether he
was on board at the time witness does not know—the pas-
sengers were landed on Staten Island to avoid injunctions.

"I. Coddington was then sworn as a witness for the plain-
tiff, who testified that he knew the negro man Michael
belonging to the plaintiff; that on Sunday, in the year 1821,
he saw him go on board the steam boat Olive Branch; she
was under way for New York. Michael was put on board
from Amboy in a small boat; the steam boat was nearest
the Jersey shore at the time; she stopped her wheels to put
him and other passengers on board, and then went imme-
diately on towards New York. The witness was near the
Amboy shore at the time; he was near Voorhies' house,

which is about fifty yards from the wharf—about fifty yards from the water; Joseph Bonnington had left the Amboy shore with some passengers in his small boat; the negro was on the shore and called to him; he came back and took the negro in, and carried them to the steam boat, and witness saw Michael get into the Olive Branch, and she went on her way to New York; it was the spring or former part of the summer of 1821.

Thomas Bloodgood was sworn, and proved that in the year 1821, on Sunday, at Amboy, he saw the plaintiff's negro man, Michael; he knew him well and talked with him; he said he was going to New York, but said nothing about a pass, or that he was looking a master; he saw him put on board the steam boat in a row boat, from the Amboy shore; the steamboat was on her way to New York, and she stopped to take the passengers from the Amboy shore in, and then went on immediately for New York; she was near the Amboy shore, and far on this side the middle of the river or sound. Witness saw the negro get into the steam boat—knew by his white trowsers; used to make shoes for him when he lived with the plaintiff; has never seen him since he went on board the steam boat.

Joseph Marsh, Esq., proved that in 1821 the steam boat Olive Branch used to receive passengers from Amboy for New York in the stream; she did not come up to the wharf; Joseph Bonnington was employed by the owner to take passengers on board from Amboy; in 1820 and 1821 the defendant was captain, and acted as such and advertised as such in those years; witness lives at Amboy; he never knew or heard of any other captain; was often on board and saw defendant there; he acted always as captain.

James Parker, Esq., testified that Captain Moore, the defendant, was the captain of the steam boat Olive Branch about four years ago, and since he first commanded her has always continued to be captain; witness never heard of any other—he always acted as captain. Witness lived at Am-

Cutter v. Moore.

boy,—in 1821 passengers were taken from Perth Amboy in small boats by Bonnington and by a black fellow named Buck, on board the Olive Branch; Captain Moore was then captain as witness understood.

"Daniel Cutter, son of the plaintiff, testified that in 1821 Michael went away from his father, who lives in Woodbridge; he went away on Sunday and did not return; his father was uneasy when he found he was not home on Monday morning; he afterwards understood he had been seen in New York, and sent his brother to look for him, but he did not find him; it was spring or fore part of summer when he ran away.

"Samuel Cutter, another son of the plaintiff, testified that his father sent him to New York to look for Michael, who had run away; he took the bill of sale and an advertisement with him; he looked for him in New York, and went to Long Island to the races, as it was reported he had been seen on Long Island; could not find him; he has never returned; he run away in 1821; the bill of sale was left with a man in New York, who used to live at his father's in Woodbridge when Michael was home, and knew him, to look out for him, but he could not find him; witness lived at home with his father when Michael ran away, and has lived there ever since; he never heard that Michael wanted to look for another master, or to be sold, or that he had a pass for that or any other purpose; his father on Monday morning, after the Sunday that Michael went away, inquired for him and was uneasy he had not come home.

"Lewis Thornton testified he knew Michael, and lived near his master, the plaintiff; thinks he was worth in 1821, when he went away, three hundred dollars; witness gave that sum for a negro man about that time, and if he wanted a negro would give that sum for Michael.

"Judge Ford, has seen Michael when he lived with plaintiff; witness does not keep slaves, but should think Michael

18

worth as much as ·most negro men of his age; he was a strong, sturdy, hearty fellow.

"The plaintiff then rested his cause and the defendant thereupon, by his counsel, moved the Court to non-suit the plaintiff, and the court after argument ordered the plaintiff to be non-suited, but to give the plaintiff the benefit of an exception to the opinion of the Court, it was agreed it should be given by way of charge to the jury, the defendant offering no evidence on his part.

" And the Court thereupon charged the jury, that the plaintiff had given no evidence to entitle him to recover, to which opinion and charge of the Court the plaintiff, by his counsel, excepted and prayed that this, his bill of exceptions, might be allowed and sealed accordingly."

Errors assigned for the reversal of the judgment.

1st. The Court admitted illegal evidence.

2d. The Court mistook the law when they ordered the Plaintiff to be non-suit.

3rd. The Court mistook the law in charging the Jury that there was no evidence to entitle the plaintiff to recover.

*Chetwood* and *Wood,* for the plaintiff in error.

*Scott,* for the defendant.

The opinion of the court was delivered by

EWING, C. J. Upon the trial in the court below of this action which was brought on the 5th section of the act of the 14th of March, 1798, entitled an act respecting slaves, *Rev. Laws,* 369, whereby it is enacted, " that if any person or persons shall be found guilty of harboring, entertaining or concealing any slave, or conveying or assisting to convey away such ·slave, and if such slave shall be lost, die or be otherwise destroyed or shall be disabled or rendered unserviceable, the person or persons so harboring, entertaining, concealing, conveying or assisting to convey away

such slave, shall be liable to pay the value of such slave to the owner or owners;" the court, after the evidence of the plaintiff was closed and without the production of any testimony on the part of the defendant, charged the jury, " that the plaintiff had given no evidence to entitle him to recover." A verdict was rendered for the defendant. The plaintiff having taken a bill of exceptions to the charge, and now alleging its incorrectness and illegality seeks to reverse the judgment, and if, as insisted by his counsel, taking all the matters shewn by him to be true, he was entitled to recover, his prayer should be granted and the cause sent to another jury.

It was fully proved on the trial, that Michael, the negro in question was the slave of the plaintiff; that he left the service of his master without consent; that he was put, in the same manner as other passengers, on board the steam boat Olive Branch, then lying in the stream near Perth Amboy, and bound from New Brunswick to New York, whither he was carried in the steam boat; and that he had been diligently but unsuccessfully sought for by his master, to whom he had been lost. The proof of these facts was not questioned on the argument here.

One witness testified that Moore, the defendant, "was the regular captain of the boat." Another, that, "in 1820 and 1821," (and the negro was proved to have been carried away in the spring or early part of the summer of 1821), the defendant was captain and acted as such and advertised as such," and this witness living at Amboy, "never knew or heard of any other captain," and having been often on board, " saw the defendant there who acted always as captain." Another witness testified, that the defendant was captain about four years before the trial, and "since he first commanded her has always continued to be captain;" that the witness living at Amboy, had "never heard of any other captain than the defendant, who always acted" as such.

This proof was abundantly sufficient, in the absence of any evidence to the contrary, to shew that the defendant was the captain of the steam boat at the time the negro was conveyed to New York, It was wholly unnecessary, as was required at the Bar, to produce the license of the vessel either as exclusive or suppletory proof. So far as regards the matter before us, even if competent proof against the defendant that he was captain, the existence of a license was unimportant. The defendant may have been captain *de facto*, without a license and as such he may have been guilty of conveying away a slave, although at the same time guilty of coasting without a license; and not less amenable to the law of New Jersey, because at the same time violating the law of the United States.

Proof that the defendant was captain at a particular time, the vessel being in her usual employ, is *prima facie* evidence that he was then on board. Such was his duty, and that he was in the performance of it, is the legal presumption. *Powel* v. *Milbank*, 2 *Bl. Rep.* 851, *Lord Halifax's case*, *Buller* 298. The evidence that the captain did not come occasionally, to avoid injunctions, and the declaration of the boatman who carried Michael and the other passengers to the steam boat, that he did not then see the defendant on board and did know whether the defendant was at the time on board, cannot overcome the presumption. They may weaken but do not destroy it. With them, less evidence on the part of the defendant may in the opinion of a jury suffice.

Proof that the defendant was captain and on board, is also *prima facie* evidence that he knew Michael, the negro in question, was conveyed in the steam boat from Amboy to New York. The captain has the care and control and management of the vessel. It his duty to know, and the law therefore presumes him to know his passengers and cargo. A person may be so privily introduced and so carefully secreted as to be concealed from his knowledge—but proof that such person was on board, where his knowledge

Cutter *v.* Moore.

of the fact subjects him to responsibility, will require him to overcome the presumption by proof of secrecy and concealment. Moreover it was shewn on the trial that the steam boat, on her way, was stopped to take passengers from Amboy, the negro and other passengers were put on board publicly and in the usual manner, and the boat immediately continued her voyage.

The law upon these facts now becomes the object of inquiry—and all that is desirable for the determination of the present case, I take to be settled by the case of *Gibbons* v. *Morse, in the Court of Appeals*, 2 *Halst.* 253. From the course of that court the grounds and reasons of their decisions are not publicly expressed, and hence when several distinct errors are assigned, the precise matter of error cannot, in case of reversal, always be known. But such difficulty does not exist here, because every material legal position in the charge of the Chief Justice on that occasion having been contested and the judgment affirmed, all those doctrines have received the sanction of the court in the last resort, for, had any one been deemed erroneous, the judgment would have been reversed.

In that case, the owner of a passage boat in which a black man who on the trial was proved to have been a slave and to have left his owner without consent, was carried from Elizabethtown to New York, with the knowledge of the captain of the boat that he was carried, but without other knowledge that he was a slave than the evidence of his color, was held liable under the same section on which the present suit was brought, to pay to the owner the value of the slave.

The only point of difference seems to be, that there the owner, here the captain, of the vessel was prosecuted—but the proposition that a captain who carries a slave in his vessel from New Jersey to New York, conveys or assists to convey away such slave, is too evident to admit of doubt or require argument.

Upon the authority of the case of *Gibbons* v. *Morse*, then I am of opinion the plaintiff had given evidence to entitle him in the absence of any contradictory evidence on the part of the defendant to recover, the charge was erroneous, and the judgment should be reversed.

Judgment reversed.